FRED R. AMSLER AND ILENE A. AMSLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Amsler v. Commissioner
Docket Nos. 24448-81, 22501-84, 22732-84, 33599-84, 33741-84, 33742-84
United States Tax Court
T.C. Memo 1991-443; 1991 Tax Ct. Memo LEXIS 492; 62 T.C.M. (CCH) 682; T.C.M. (RIA) 91443; September 10, 1991, Filed *492 Decisions will be entered under Rule 155 in docket Nos. 22501-84 and 22732-84. An appropriate Order will be issued in docket Nos. 24448-81, 33599-84, 33741-84, and 33742-84. During years in issue, petitioners paid amounts to William T. Irwin purportedly for investment in commodity transactions through foreign partnerships. No amounts were invested by Irwin in foreign partnerships or in commodity transactions for the accounts of petitioners. Confirmations of such transactions and partnership information returns provided to petitioners were based on fictitious transactions. Petitioners claimed deductions for losses purportedly incurred in commodity transactions carried out on their behalf. Held: 1. The commodity transactions purportedly carried out through foreign entities were a factual sham and the losses claimed from such transactions are disallowed. 2. The additions to tax for negligence are sustained as to petitioners Amsler. 3. The increased interest on deficiencies attributable to tax motivated transactions is sustained.
William Randolph Klein, for the petitioners. Robert J. Shilliday, Jr., and Adolf J. Dean, Jr., for the respondent. *493 DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: [SEE TABLE IN ORIGINAL] *494 Respondent also determined deficiencies in, and additions to, petitioners' Federal gift taxes as follows: Z[SEE TABLE IN ORIGINAL] In addition, respondent seeks the increased rate of interest provided by section 6621(c), previously section 6621(d), on substantial underpayments due to tax motivated transactions for deficiencies relating to docket Nos. 24448-81, 22501-84, 22732-84, and 33599-84. These consolidated cases concern losses claimed by petitioners from investments in partnerships or trusts (Amsler Firstcom S.A. Trading Account, Fred R. Amsler, Jr. Grantor Trust and Charles E. Manthey Grantor Trust) which then allegedly engaged in 100 percent financed commodity trading transactions through a number of foreign partnerships (Firstcom Partnership, Firstcom S.A. Partnership, Euro Partnership, Continental Partnership, Irwin Eurotrade Partnership, Precious Metal Traders Partnership and United Partnership). After concessions, the issues for decision are: (1) Whether *495 the commodity trading transactions allegedly engaged in by the foreign partnerships were bona fide commodity transactions during the years in issue or were factual shams; (2) whether the alleged commodity trading transactions lacked economic substance; (3) whether the alleged commodity trading transactions were entered into by petitioners for profit; (4) whether petitioners are entitled to claimed interest deductions; (5) whether petitioners Fred R. Amsler and Ilene A. Amsler are liable for additions to tax under section 6653(a) for 1976, 1977, 1978, and 1979; and (6) whether petitioners are liable for the increased rate of interest provided for by section 6221(c). The gift tax issues and family trust issues were severed from these consolidated cases for a separate trial, if necessary, at a later date. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Fred R. Amsler and Ilene A. Amsler, husband and wife, maintained their legal residence in Williamsport, Pennsylvania, at the time the petitions were filed. Petitioners Charles E. Manthey and Catherine Manthey, husband and wife, maintained their legal residence in Sea Ranch Lakes, Florida, at the *496 time the petitions were filed. The use in this opinion of terminology concerning partnerships and trusts and concerning various commodity trading transactions should not be construed as a finding that such entities were or were not created or that the transactions are or are not valid for Federal income tax purposes. Instead, such terminology is used only for convenience. Fred R. Amsler (Amsler or Dr. Amsler) is a physician specializing in orthopedic surgery in Williamsport, Pennsylvania. He received a bachelor of arts degree in chemistry and biology from Bucknell University in Lewisburg, Pennsylvania. He received his doctor of medicine degree from Temple University School of Medicine in Philadelphia, Pennsylvania, in 1959. After a rotating internship at St. Lukes Hospital in Duluth, Minnesota, Dr. Amsler completed one year of specialty training in orthopedic surgery at Hamot Hospital in Erie, Pennsylvania, and then entered the Medical Corps of the United States Navy. Dr. Amsler served in the Navy for approximately 8-1/2 years. In 1962, he obtained a military orthopedic surgical residency at the Naval Hospital in Philadelphia, Pennsylvania. He spent one year as a member of *497 a surgical team in Vietnam. Upon returning from Vietnam, he was stationed at St. Alman's Hospital in New York City, New York, until he retired as a commander in the Medical Corps of the Navy in 1969. Charles E. Manthey (Manthey or Dr. Manthey) is a physician specializing in anesthesiology. Dr. Manthey attended Western Reserve University in Cleveland, Ohio, where he studied premedical courses as an undergraduate. At the conclusion of his third year at Western Reserve University, he entered medical school at George Washington University in Washington, D.C. Dr. Manthey completed his medical training in Washington, D.C. He has been practicing medicine since 1951 and is board certified in the specialty of anesthesia. William T. Irwin (Irwin) structured numerous programs, both domestic and foreign, during the 1970s and early 1980s which he promoted as devices through which American investors could recognize large tax deductions with small initial investments. Irwin's programs purported to involve various entities engaging in commodity transactions. Programs which Irwin prepared for 1976 and thereafter provided that the American investor would hold his investment through a grantor *498 trust. The grantor trust, which the American investor funded, would invest in a foreign partnership which would be a broker and dealer in the commodities business. In a "Confidential Report to Potential Investors," Irwin suggests that since the foreign partnership will not be conducting business within the United States, it "will not need to file a U.S. partnership return." The foreign partnership was to engage in commodities transactions. The trustee of the grantor trust would file annual fiduciary income tax returns (Form 1041) for the trust and provide copies to the U.S. investor to file with his individual income tax return. Profits and losses would flow through to the returns filed by the individual U.S. investors. Irwin's files include a description of a prototype of a "grantor trust" program he promoted: Assume that an investor desires $ 100,000 of ordinary loss and for this he is willing to put up $ 20,000 in cash. The $ 20,000 is put into a grantor trust. [The Trustee] then purchases a general partnership interest in a foreign partnership in the name of the grantor trust. The foreign partnership then goes to a European bank and acquires enough gold so that the *499 carrying charges, i.e. insurance, interest, warehousing charges from August 1, 1977 (date of purchase) to December 31, 1977 will be $ 100,000.
In the memorandum the financing aspects of the transaction are explained as follows: In Europe there is no margin requirement for gold bullion; therefore, the total amount of gold required can be 100% financed with a European bank. If we assume that the carrying charge on gold bullion is currently 10%, and since we only have 147 days left in 1977, he would have to buy $ 2,500,000 of gold. Within 3 to 5 days after the purchase of the gold, the partnership would enter into a contract to sell the gold for a profit of $ 15,000 to $ 20,000 with the gold to be delivered and payment to be received around January 15, 1978. On December 29th or 30th of 1977, the partnership would borrow money to pay all carrying charges, i.e. the $ 100,000 incurred on the gold since purchase.
The memorandum sets out the tax results for the individual participant as follows: The partnership is a broker dealer in precious metals and commodities and therefore all expenses are deductible as operating expenses. The partnership return would be filed showing *500 that the grantor trust would have $ 100,000 of ordinary loss (net operating loss) and the loss would flow through the grantor trust to the individual investor. In 1978, when the gold is sold, assuming a $ 20,000 profit, the partnership would have ordinary income of $ 120,000, i.e. $ 100,000 of carrying charges plus the $ 20,000 profit. The gain is ordinary because the partnership is a dealer.
In the memorandum the technique for eliminating tax on the gain from the second leg of the prototype transaction is explained: [The Trustee] would then enter into a transaction with the partnership's bank to arbitrage in foreign currencies. Margin requirements on arbitrage of foreign currencies is 10%, however, because of the relationship with the bank, it is possible to give the banks a larger spread on the arbitrage transaction and put up only the $ 15,000 to $ 20,000 of cash which the partnership holds for the investor's account. Through bookkeeping entries, the bank will charge commissions and other fees totaling $ 120,000 and proper broker's admittance advices will be issued reflecting $ 120,000 of commissions. However, the total cash paid will be only $ 15,000. The K-1 for *501 the investor will reflect $ 120,000 of ordinary income less $ 120,000 of commissions and other expenses resulting in zero income or loss. (From a practical standpoint there will be several hundred dollars of gain or loss since it is impossible to exactly zero out).
Irwin's file memorandum concludes that by use of the prototype transaction "the investor who puts up $ 20,000 will receive a $ 100,000 write-off in 1977." The explicit suggestion is that by participating in the program, within 9 months an investor in the 50- percent bracket will save $ 50,000 in taxes, less the $ 20,000 investment. On April 28, 1986, Irwin was convicted on several criminal counts in the United States District Court for the Southern District of Florida. Irwin was convicted, inter alia, for unlawfully, willfully, and knowingly conspiring to defraud the United States, by impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of revenue by promoting, operating, and managing a fraudulent tax shelter through which taxpayers, including Irwin, would and did claim improper deductions on their Federal *502 income tax returns, and by deceiving the investors and the Internal Revenue Service concerning the disposition of the funds and assets obtained through the fraudulent tax shelter. Further, the District Court held that it was part of the conspiracy that investors would be deceived into believing that their funds, placed into grantor trusts, then were being invested in foreign partnerships which engaged in the purchase and sale of commodities, particularly gold and silver, on the international market. These grantor trusts and foreign partnerships include, inter alia, the grantor trusts and foreign partnerships which are at issue in this case. As a result of the conviction for the aforementioned crimes and others, Irwin was sentenced to 62 years of imprisonment and fined $ 67,000. The foreign partnerships in which petitioners supposedly invested through their respective grantor trusts were the Firstcom Partnership (Firstcom), the Euro Partnership (Euro), the Continental Partnership (Continental), the Irwin Eurotrade Partnership (Eurotrade), the Precious Metal Traders Partnership (Precious Metal Traders), and the United Partnership (United). Dr. Amsler also made investments in Firstcom *503 S.A. Partnership (Firstcom S.A.) through the Amsler Firstcom S.A. Trading Account. Firstcom was formed in July of 1977, Euro on March 1, 1978, Continental on May 28, 1979, Precious Metal Traders on December 14, 1977, and United on November 5, 1979. Each was domiciled in Vaduz, Liechtenstein. The "Partnership Agreement" of each of these foreign partnerships states that three partners, World Overseas Trading Anstalt (WOTA), Switex, Anstalt (Switex), and Irwin, each made original cash contributions to the partnership capital in the amount of $ 5,000. The purpose of each, as stated in the partnership agreement, was to "act as a buyer, seller or in any other capacity on the commodity markets of any kind throughout the whole world, such as cash markets, cash forward markets, futures markets or options markets." Both WOTA and Switex were organized by Dr. Jean-Marc Vuille (Vuille), a Swiss attorney, and were wholly owned by Irwin at all relevant times. Firstcom, Euro, Continental, Precious Metal Traders, and United did not engage in any commodity transactions, including the buying and selling of gold or silver, at any time during the years in issue. Eurotrade was formed on October 15, *504 1975, with its domicile in Vaduz, Liechtenstein. The Eurotrade "Partnership Agreement" states that two partners, Irwin and Diane L. Maddox, each made original capital contributions to Eurotrade in the amount of $ 10,000. The purpose of Eurotrade, as stated in the partnership agreement, was to "act as a buyer, seller, or in any other capacity on the commodity markets of any kind throughout the world, such as the cash markets, cash forward markets, futures markets or options markets." Effective November 1, 1976, John Hayes (Hayes) was admitted as an additional partner in Eurotrade. Eurotrade did not engage in any commodity transactions, including the buying and selling of any gold or silver, at any time during the years in issue. Firstcom S.A. was formed on December 28, 1976, with its domicile in Zurich, Switzerland, but its domicile changed numerous times. On November 10, 1977, Firstcom S.A. was organized by "Memorandum of Association" in the Cayman Islands. According to this memorandum, the purposes for which Firstcom S.A. was established included dealing generally in commodities. Firstcom S.A. did not engage in any commodity transactions, including the buying and selling of *505 gold and silver, at any time during the years in issue. Irwin Management Activities
In 1973 or 1974, Irwin formed a wholly owned company in California called Irwin Management, Inc. (Irwin Management, later called Irwin Trading). In 1977, he formed another wholly owned company by the same name, Irwin Management, in Florida. Around February 1976, Joan Wilhelm Rose (Rose) began working for Irwin at Irwin Management in California. Rose took over all bookkeeping duties, opened all the mail, made all of the bank deposits, and generally performed all of the administrative duties for Irwin Management in California. Also, Rose, on a daily basis, clipped foreign exchange market and cash prices of commodities out of the Wall Street Journal newspaper, taped the clippings to an 8-1/2 by 11 sheet of paper, and filed them. Rose was encouraged, by Irwin, to invest in Eurotrade while she was employed by Irwin Management. She did not have the funds, need, or desire to invest in Eurotrade, but Irwin was insistent that she invest. Accordingly, Irwin wrote her a personal check which she immediately endorsed back over to Irwin Management. She did not claim a deduction for the alleged investment *506 in Eurotrade on her 1976 tax return. The first clients for Irwin Management were obtained in May of 1976. Hayes recruited the clients during this time. He was an outside salesman who paid his own expenses and received a commission. Irwin brought in a few of the clients while Rose was employed by him. Rose filled in a standard worksheet for each investor in Eurotrade. Irwin created the original format of the worksheet and then it was retyped and copied and used on a regular basis. He would then provide figures as to the price of gold and quantities of gold allegedly purchased. Rose filled in the standard worksheet with the figures provided by Irwin. Following her usual procedure, from the worksheet, Rose would generate a cash commodity agreement which was an agreement between the client and Irwin Management showing the amount of money received from an investor and acceptance of such amount. Then a "management advisory agreement" was executed between the investor and Irwin Management generally establishing that Irwin Management would advise the investor on which commodities to purchase. Irwin Management then would generate a confirmation to purchase gold for an investor at *507 a specified price. No documentation was received from any foreign exchanges or commodity exchanges that would substantiate the confirmations to buy gold. Next, a confirmation to sell gold would be generated and again no documentation to substantiate ever was received. The next document generated was a nonrecourse note for the total purchase price of the gold. Then a security agreement was executed listing gold certificates, contractual rights and other evidence of rights, and the ownership of the gold bullion, as well as accounts and contractual rights to the cash forward sale of gold bullion, as collateral for financing the gold. Rose never saw a gold certificate. A "Power of Attorney and Hold Harmless Agreement" then was executed between Irwin Management and the investor. Irwin Trading GmbH was incorporated, pursuant to Irwin's instructions, on September 10, 1976, and was domiciled in Frankfurt, Germany. Rose typed, or supervised the typing, of all correspondence and documents for Irwin Trading GmbH from Irwin Management in California. She prepared statements of account and confirmations from Irwin Trading GmbH to Eurotrade. She also prepared final settlement documents *508 from Irwin Trading GmbH to Eurotrade which indicated gains or losses from buying and subsequently selling silver. She also prepared notes from First National Commerce and Finance Corporation (First National). First National supposedly was the bank which financed the purchase of gold and silver by Eurotrade and the other foreign partnerships. First National was a corporation which was incorporated in the Cayman Islands by Bruce Campbell (Campbell), an attorney in the Cayman Islands, in 1974 at the request of Dr. Gunther Phillips, an attorney in Munich, Germany. Campbell was acting director of First National at this time. Dr. Phillips, owner of First National, transferred such ownership to Irwin sometime in late 1975 or early 1976. In mid-1976, Irwin traveled to the Cayman Islands to meet with Campbell and pay all fees relating to First National. Until this time, First National was a dormant company that had conducted no business. Campbell continued to act as director until November 1978. From the 1974 incorporation of First National until November 1978, no business of any sort was transacted by First National. Because of problems which arose between Campbell and Irwin, the *509 administration of First National, along with other companies owned by Irwin and registered in Campbell's office (Hendred Investments Limited, Anglo Swiss Metals Limited, and Firstcom S.A.), was transferred to Ian Paget-Brown (Paget-Brown), another Cayman Islands attorney. From November 1978 until 1985, Paget-Brown and two members of his staff acted as shareholders of First National for the benefit of Irwin, the beneficial owner. During this time, November 1978 to 1985, First National was a dormant company that transacted no business. First National never loaned any money to the foreign partnerships or provided funds to finance the purchase of any gold or silver bullion or other commodities. Irwin received between $ 750,000 and $ 760,000 from investors during 1976 with regard to Eurotrade. When funds were received, Rose had the money transferred out of the country to Irwin's accounts in the Royal Bank of Canada in Canada or in London, England. On October 5, 1977, Joy Hille (Hille) went to work for Irwin Management in Florida. Hille graduated from Oxon Hill High School in Maryland and attended various night courses in business and secretarial skills. Then she worked as a secretary *510 for the Central Intelligence Agency. Hille moved to Fort Lauderdale, Florida, and worked as a legal secretary for a law firm and then became employed by Irwin. In mid-December 1977, Beverly Savant (Savant) began working for Irwin Management in Fort Lauderdale, Florida. Savant graduated from Banning High School in Los Angeles, California. She attended numerous colleges and had bookkeeping positions with various firms. She worked for the accounting firm of Coopers and Lybrand, as an in-house bookkeeper for 3 years at the firm's offices in Fort Lauderdale and Miami, Florida. In 1973, she began working as an in-house bookkeeper for Peat, Marwick, Mitchell and Co. (Peat, Marwick). She remained employed by that accounting firm until she was hired by Irwin Management. Hille's initial duties at Irwin Management included typing trust agreements and partnership agreements, filing, copying, answering the phones, and balancing Irwin's personal checking account and Irwin Management's checking account. By December 1977, she was typing large numbers of trade confirmations and balance sheets. After February 1978, she began to travel to the Bahamas and the Cayman Islands for Irwin to make *511 bank deposits of checks and bring back into the United States cash and checks. Eventually Hille became Irwin's most trusted employee and was placed in charge of the office, subject to his instructions. At one point, due to his marital problems, Irwin set up an entity called Joy Hille and Associates and moved Hille into a suite in an office building next door to the building he was in. However, during this time Hille still received her salary from Irwin and all duties she performed were under his direction and control. At various times during her employment with Irwin Management, from 1977 to the end of 1981, Hille made numerous trips overseas and at one point rented a home in Freeport, Bahamas, where she worked. Savant's initial duties included cutting excerpts of financial and commodity markets out of the Wall Street Journal newspaper and making calculations from figures in the excerpts and filing both of them. She also created commodity trade confirmations for Firstcom by copying confirmation data typed by Hille regarding quantity, type of commodity, trade price, and amount onto standardized First National stationery. The confirmations which Savant created were incorporated *512 into the books and records which she generated for Firstcom. Once all of the books and records of Firstcom were generated, at the direction of Irwin, Savant put together an audit notebook, which was a summary of all the business allegedly transacted by Firstcom in 1977. The audit notebook consisted of: (1) A chart of accounts for Firstcom; (2) a balance sheet for Firstcom for 1977, which was generated from the books and records created by Savant, Hille and Irwin; (3) Firstcom income statement for 1977; (4) a Firstcom cash statement, which allegedly represents cash coming into Firstcom and cash going out to pay interest; (5) confirmation sheets from First National which allegedly confirmed the cash transactions represented in the Firstcom cash statement; (6) the Firstcom subsidiary ledger showing cash receipts, partners' capital, cash purchases of commodities, cash sales of commodities, cash forward purchases, cash forward sales and a schedule of notes payable to First National; (7) copies of the notes payable; (8) statement of account; (9) statement of Firstcom losses; (10) statement of Firstcom gains; (11) additional notes payable to First National; and (12) copies of Firstcom *513 journal entries. All of the books, records, and audit notebook contents were created for Firstcom through the efforts of Irwin, Savant, and Hille. None of the information contained in the books, records, and audit notebook of Firstcom, with the exception of the amounts of partners' investments, reflects accurate information or actual transactions. Firstcom actually conducted no business, received no loans, and did not purchase or sell any commodities during 1977. After all of the false audit information with respect to Firstcom had been prepared, it was packaged for examination by the accounting firm of Tansley, Witt in London, England, who had been engaged to conduct an audit of Firstcom books and records. Irwin was very determined to have the financial documents of Firstcom audited in order to lend validity to the partnership in the eyes of both the Internal Revenue Service and the investors. In February of 1978, Savant and Hille delivered the materials to Tansley, Witt's offices in London, England. After approximately 1-1/2 days, a Tansley, Witt representative contacted Savant and Hille and requested a meeting. At that meeting at Irwin's direction, Savant and Hille declined *514 to respond to inquiries made by Tansley, Witt. After Savant and Hille returned to Florida following their meeting with Tansley, Witt, Irwin received a telex from the accounting firm setting out various questions concerning the materials delivered for audit. At Irwin's direction, Hille traveled to the Cayman Islands in order to send a telex to Tansley, Witt regarding the requested information. She sent the telex from the Cayman Islands to make it look as though the telex had been sent by First National. Tansley, Witt did an investigation of the materials and again contacted Irwin requesting additional information required for an audit. A few days later, Tansley, Witt wrote Irwin to the effect that they rejected the documentation sent by Irwin and would be unable to perform an audit without proper documentation. Irwin attempted various ways of confirming the false Firstcom materials but was not successful in convincing Tansley, Witt that they should perform an audit on the partnership. After numerous unsuccessful attempts to convince Tansley, Witt and other public accounting firms to perform audits of the false Firstcom materials, Irwin began searching for a controllable accounting *515 firm, an accounting firm that was in such poor financial condition that he might be able to control it. Irwin finally located, through Vuille in Switzerland, an accounting firm named Mercedes, which was later renamed Merides. Irwin sent to Merides the same information which he previously had sent to Tansley, Witt and in 2 to 3 weeks Merides returned audited reports for Firstcom for 1977. After 1977, no additional books were created for any of the foreign partnerships. All purchases and sales of commodities and interest figures were created by Savant and Irwin and calculated using information from the Wall Street Journal. From this information Savant would generate an income statement and a balance sheet. Then Hille and Savant would produce statements of partners' capital as a basis for preparing the American investors' U.S. Fiduciary Income Tax Returns (Forms 1041). Savant did most of the computations for Irwin in the later years. She would take a list of the American investors and how much they invested into the various partnerships. Then Irwin or Hille, acting for Irwin, would provide her with a percentage to calculate the amount of loss Irwin wanted for each of the U.S. *516 partners. In 1978, Savant generated the statement of partners' capital for Euro. She created a balance sheet and income statement for Euro from supposed commodity purchase and sale transactions that she generated to arrive at the loss percentage specified by Irwin. She then used the statements of partners' capital to prepare the Forms 1041 for all partners of Euro for 1978. Savant generated all of the transactions and documents for each of the partnerships for 1978, 1979, and 1980. The funds made available to investors' grantor trusts, including Amsler's and Manthey's, were not invested in the various foreign partnerships as represented by Irwin. Instead, some of the investors' funds were used to pay various expenses, but most were used or kept for Irwin's personal benefit. The funds which were designated for use by Firstcom were deposited into four bank accounts. These funds were disbursed as follows: [SEE TABLE IN ORIGINAL] The $ 663,105 designated as intercompany transfers was expended as follows: [SEE TABLE IN ORIGINAL] *517 The Finders Fees category represents amounts paid to various individuals for referring investors to the entities Irwin established. The funds from investors which were designated for use by Euro were deposited into bank accounts. These funds were disbursed as follows: [SEE TABLE IN ORIGINAL] The Cash/Cashiers Checks category represents money taken out of the accounts in cash or cashiers checks for which the ultimate disposition is not known. The record does not include information as to the actual disposition of funds paid in for investment use by the other foreign partnerships. Amsler and Dr. Manthey invested in a number of the foreign partnerships through Grantor Trusts organized by Irwin. Fred R. Amsler, Jr. Grantor Trust
Dr. Amsler first met Irwin in 1977 through a friend, Dr. Lestrange, a college classmate. Dr. Lestrange informed Amsler about investment opportunities with Irwin. Dr. Amsler discussed the proposed investments in "general terms" *518 with his accountant in Williamsport, Pennsylvania. At the time Amsler made his initial investment in one of the foreign partnerships, he knew nothing about the commodities markets. He relied primarily on Dr. Lestrange's representations with respect to Irwin and the investments. On August 24, 1977, Amsler executed a trust agreement by which Thomas R. Hudgens (Hudgens) was appointed trustee of the Fred R. Amsler, Jr. Grantor Trust (Amsler Grantor Trust). Hudgens continued as trustee for the Amsler Grantor Trust during 1977 and 1978. During 1979, Roland L. Cataldo (Cataldo) was appointed "substitute trustee." In 1977, Amsler invested $ 35,000 in the Amsler Grantor Trust of which $ 34,250 was to be transferred to Firstcom and $ 750 paid to Hudgens as a trustee fee. In 1978, Amsler invested $ 50,000 in Euro through the Amsler Grantor Trust. In 1979, Amsler invested $ 50,000 in Continental through the Amsler Grantor Trust. In 1977, Amsler invested $ 17,500 in the Firstcom S.A. Trading Account through the Amsler Grantor Trust. Charles E. Manthey Grantor Trust
On December 10, 1976, Manthey executed a trust agreement under which Hayes was appointed trustee of the Charles E. *519 Manthey Grantor Trust (1976 Manthey Grantor Trust). On December 15, 1977, Irwin Management was appointed substitute trustee of the 1976 Manthey Grantor Trust. On August 15, 1977, Manthey entered into a second trust agreement (1977 Manthey Grantor Trust) under which Hudgens was appointed trustee. On June 23, 1978, Manthey entered into a third trust agreement (1978 Manthey Grantor Trust) under which Irwin Management was appointed trustee. By agreement dated January 31, 1979, Cataldo was designated substitute trustee for the 1978 Manthey Grantor Trust. On September 9, 1979, Manthey entered into a fourth trust agreement (1979 Manthey Grantor Trust) by which Cataldo was appointed trustee of the trust. Through the various Manthey Grantor Trusts, Manthey invested the following amounts in the foreign partnerships: (1) $ 19,086 in 1976 in Eurotrade; (2) $ 30,750 in 1977 in Firstcom (of which $ 750 was allocated to the trustees' fee); (3) $ 20,000 in 1978 in Euro; (4) $ 20,000 in 1979 in Continental; and (5) $ 30,000 in 1980 in United. The U.S. Fiduciary Income Tax Returns filed by the Amsler Grantor Trusts and Manthey Grantor Trusts set forth the source and amount of losses claimed on *520 Dr. and Mrs. Amsler's and Dr. and Mrs. Manthey's respective income tax returns as follows: [SEE TABLES IN ORIGINAL] On their Federal income tax returns for the years in issue, petitioners reported income from the following sources and adjusted gross income *521 in the following amounts rounded to the nearest dollar: [SEE TABLE IN ORIGINAL] *522 The losses claimed by petitioners relative to their adjusted gross income, exclusive of such losses, are as follows: [SEE TABLE IN ORIGINAL] In the case of Manthey for 1976, his claimed losses from the Manthey Grantor Trust were $ 107,000. This amount was combined with other income and losses on his Supplemental Income Schedule (Schedule E) to arrive at a loss of $ 85,610. This loss was subtracted from his business income, as reported on his "Profit or (Loss) From Business or Profession" (Schedule C), and from his capital gains for 1976 in the computation of other income of $ 37,695. Dr. and Mrs. Manthey reported adjusted gross income in 1976 in the amount of $ 62,304. In the absence of the $ 107,000 loss from the Manthey Grantor Trust, they would have reported adjusted gross income in the amount of $ 169,304, so that the Manthey Grantor Trusts' losses offset 63 percent of the Mantheys' adjusted gross income. In the notices of deficiency *523 mailed to petitioners, respondent disallowed all losses claimed by petitioners through the Amsler Firstcom S.A. Trading Account, Amsler Grantor Trusts, and Manthey Grantor Trusts. The amounts disallowed are as follows: [SEE TABLE IN ORIGINAL] ULTIMATE FINDINGS OF FACT (1) All transactions among the Amsler Grantor Trusts, or Amsler, and Firstcom S.A., Firstcom, Euro, and Continental were factual shams because they were illusory and fictitious and were not bona fide transactions. (2) All transactions among the Manthey Grantor Trusts and Eurotrade, Precious Metal Traders, Firstcom, Euro, Continental, and United were factual shams because they were illusory and fictitious and were not bona fide transactions. (3) All transactions among First National and Eurotrade, Precious Metal Traders, Firstcom S.A., Firstcom, Euro, Continental, and United were factual shams because they were illusory and fictitious and were not bona fide transactions. *524 (4) No commodities, including gold and silver bullion, were ever purchased, sold, or owned by Eurotrade, Precious Metal Traders, Firstcom S.A., Firstcom, Euro, Continental, or United. (5) Petitioners never purchased or held any gold or other commodity or any right to delivery of any commodity as a result of any of the purported transactions here in issue. OPINION The primary issue in these consolidated cases is whether the losses claimed by petitioners are bona fide losses resulting from actual trading in commodities or are the result of fictitious transactions and based upon factual sham. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." In the case of individuals, deductions are limited, inter alia, to losses incurred in a trade or business, in a transaction entered into for profit, or as a result of a casualty or theft. Sec. 165(c). To be deductible, the claimed loss must be the result of a bona fide transaction, and substance, not mere form, shall govern in determining a deductible loss. Sec. 1.165-1(b), Income Tax Regs.
Respondent's determination that the underlying transactions are factual *525 shams and not bona fide transactions is presumptively correct. Petitioners have the burden of producing evidence to rebut the deficiency determination and the burden of persuasion to substantiate the claimed loss deductions. Sochin v. Commissioner, 843 F.2d 351, 355 n.9 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); see Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners have failed to establish that the transactions leading to the alleged losses they have deducted were bona fide. The record here clearly shows that the purported investment programs from which the losses allegedly arose were fictional descriptions of transactions which never occurred and were mere factual shams concocted solely to enrich the promoter and manager of the sham programs, William T. Irwin, and to provide tax benefits to the so-called investors. Irwin's files include one description of a supposed model transaction by which a prospective investor might obtain $ 100,000 of tax deductions by paying $ 20,000 for bullion. Under this proposal, the losses in the first year would result from carrying charges and *526 the offsetting gain would result from trading profits and supposed gain from arbitrage in foreign currencies. In such a transaction, Irwin proposed to sell to a taxpayer with sufficient income taxed at 50 percent a net tax benefit of $ 50,000 for a price of $ 20,000. There is no evidence that such a transaction actually took place for the account of any of petitioners. Other purported transactions in these cases generally are in the nature of commodity straddles involving the purchase of gold or silver and the acquisition of a corresponding futures contract to deliver or sell an equivalent amount of the same commodity at a date far enough in the future to assure capital gain treatment on the sale. Typically such transactions are done on margin, that is, with borrowed funds. Also, typically the legs of the straddle would vary in value with market conditions so that the purchase or long leg might show a profit and the sale or short leg might show a corresponding loss -- or vice versa. Before the changes effected by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, by closing the loss leg of the straddle at an appropriate time, a taxpayer-investor in a commodity *527 straddle could use the loss to offset or defer tax on unrelated income to a later year. The closed leg of the straddle could be replaced by another position and the process of deferral could be continued into the future. In Smith v. Commissioner, 78 T.C. 350, 365 (1982), affd. by unpublished opinion 820 F.2d 1220 (4th Cir. 1987), in connection with an analysis of straddle transactions, this Court said, "If [the taxpayer's] analysis of the tax law is correct, nothing but commission costs and death would prevent a taxpayer from perpetually straddling, achieving perhaps the ultimate tax goal of permanent deferral." In the present case, the transactions purportedly were conducted through grantor trusts investing in foreign partnerships and all the financing and trading allegedly was accomplished in foreign countries and by entities which did not file U.S. tax returns. Nevertheless, the claimed tax effect for the individual U.S. taxpayer is the same as in other straddle cases, i.e., to offset claimed losses against earned income or other unrelated income and to carry forward the tax deferral through repeated commodity straddle transactions year after *528 year. The transactions in issue here were factual shams. As in other cases involving deductions based on alleged commodity trading which did not take place on recognized exchanges, the initial question is whether the purported transactions were "factual shams," that is, whether "there was any real market or trading." Forseth v. Commissioner, 85 T.C. 127, 165 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. in an unpublished opinion sub nom. Wooldridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. in an unpublished opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987); Freytag v. Commissioner, 89 T.C. 849, 876-877 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue U.S. (June 27, 1991). In other cases, respondent and the courts have relied upon sophisticated analysis of trading data to show the improbability that alleged transactions could *529 have taken place. In the present cases, however, the parties have presented conflicting direct evidence from the individuals who conducted the purported commodity trading. In our view this evidence and the supporting data determine whether the commodities trading here were bona fide or sham. Petitioners testified that they were introduced to Irwin as an experienced commodities trader and that they relied upon him to conduct trading for their accounts. Irwin testified that he had initial experience in a family grain trading business and that he had a high degree of knowledge and skill in commodity trading, in international business, and in using computers in trading. Irwin's extensive testimony was to the effect that he participated in the organization of foreign partnerships, that he transferred funds to the foreign partnerships, and that the actual trading was conducted by foreign nationals designated by the other general partners. Irwin represented that the bona fides of the transactions could be established by the testimony of foreign nationals associated with the other general partners and particularly the attorney and auditors of the partnerships. Unfortunately, according *530 to Irwin, all these foreign nationals were under indictment as his co-conspirators in various criminal acts centering about the commodity transactions here and, therefore, declined to visit the United States. At the time of his testimony, Irwin already had been convicted of criminal activities in connection with the commodity trading transactions here in issue. Petitioners did not introduce testimony of the foreign nationals by deposition or otherwise, and there is no indication that they made any effort to arrange for such depositions. Despite Irwin's -- and petitioners' -- argument that respondent was guilty of various "dirty tricks" against him and had engaged in an extensive plot against him, we consider Irwin's testimony blatantly self-serving. We are not convinced by his testimony that documents establishing the genuineness of the transactions in issue exist in Switzerland or Liechtenstein or that foreign nationals are willing or able to substantiate his testimony. Respondent relies upon the direct testimony of Irwin's former employees and associates that the supposed commodity transactions were mere fabrications. Joan Rose, Joy Hille, and Beverly Savant, who were Irwin's *531 office employees during the years in issue, testified that they prepared the underlying trading documents, including the confirmations for the purported commodity transactions, and also prepared the books and records for the foreign partnerships. Irwin advised his staff of the amount of loss required for a specified client for a particular period, and the staff members, working from pages of the Wall Street Journal they clipped and maintained under Irwin's overall direction, prepared documents for trading and confirmation of trades to establish the desired loss. Savant testified that Irwin had trained her to make the necessary computations and Hille explained that she typed the required correspondence and confirmations on stationery and forms which she had ordered from various printers. When signatures of officials were required, Irwin's staff made up the names and forged the signatures. Irwin sought to obtain an auditor's report as to his operations. To this end, he had Savant and Hille prepare detailed books and records and backup documentation for 1977 transactions and bring them to London for review by the accounting firm of Tansley, Witt. When Tansley, Witt requested that *532 banking and finance companies in the Cayman Islands confirm information furnished to the accountants, Hille went to the Cayman Islands and sent telex confirmation to Tansley, Witt. The telex documents, however, reflect that they were sent by the supposed financial institution from a public booth. When Tansley, Witt declined the audit engagement, Irwin, with the assistance of his Swiss attorney, Vuille, arranged for an audit by a group of Swiss accountants who initially called their firm Mercedes and later changed to Merides. The audit was accomplished promptly on the same documentation rejected by Tansley, Witt and in later years it was accomplished without any pretense at backup documentation. Hille testified that Irwin considered Merides a controlled accounting firm. She and certified public accountant Thomas Hudgens traveled to Switzerland and made a pro forma visit to the offices of Merides. But the accountants did not show them any backup for their audit and Hudgens made no forceful effort to see documentation or make any verification of Merides' audit procedures. While Irwin asserted that Merides' personnel could establish that they conducted bona fide audits of his operations, *533 petitioners presented no evidence of such audits. No witness who visited their offices saw any evidence that these accountants carried out meaningful audit procedures with respect to Irwin's operations. Hille's testimony is that the so-called audits were a rubber-stamp procedure. Ian Paget-Brown testified in detail concerning First National, the entity which Irwin represented as the bank which loaned large amounts of money to the foreign partnerships so they could purchase gold and silver bullion. Paget-Brown testified in a credible manner that First National was not a bank but merely a dormant company which transacted no business during the time when Paget-Brown was designated as an officer-shareholder. He made it clear, through his testimony to which we give great weight, that First National never loaned any money to the foreign partnerships and, in fact, never engaged in any business. As to the disposition of cash, the testimony of Irwin's associates is clear. Hille explained that she regularly traveled to the Bahamas and the Cayman Islands for Irwin to make deposits of checks and to bring back to the United States cash and cashiers' checks. She carried the cash hidden *534 in her clothing. John Brockwell, who also worked for Irwin, confirmed that he accompanied Hille on these money-laundering trips and also participated in bringing cash back to Irwin. Documentation from Irwin's bank accounts, as analyzed and summarized by respondent's personnel, confirms Hille's testimony that the money Irwin collected from investors was not invested in commodity trades but was diverted for Irwin's personal benefit. For example, of the $ 692,988 paid by investors into the Firstcom partnership, disbursements included $ 41,746 for a diamond ring purchased by Irwin, $ 210,000 for a house for Irwin, $ 171,948 for Irwin personally, $ 38,256 for cash, $ 20,156 for finders fees, $ 10,695 for Irwin employees and associates, $ 1,647 for office expenses, $ 1,000 for accounting fees, $ 43 for bank service charges, and $ 82,272 for intercompany transfers. The reason for the disbursement of $ 87,518 is unknown. Of the $ 1,400,500 designated by investors for use by the Euro partnership, $ 478,464 was allocated to Irwin personally, $ 78,343 to finders fees, $ 4,232 to office expenses, $ 147,724 to cash and cashiers' checks which were expended in ways not accounted for, $ 39,009 *535 to Irwin employees and associates, $ 318,985 to intercompany transfers, and $ 333,743 to unknown purposes. The pattern of disposition of cash is clear; Irwin collected moneys for investment in the foreign partnerships but diverted the bulk of it for his personal benefit with smaller amounts utilized for such items as finders fees and cash payments to employees and associates. No significant funds were available for investment and there is no credible evidence of any investment of partnership funds in commodities or securities or for any income-producing purpose. Hille and Savant and other former Irwin associates testified unequivocally that Irwin diverted the funds paid by investors from the partnership for his own benefit and failed to invest the partnership funds in commodities or for profit. Hille and Savant and others testified that they assisted Irwin in preparing phony documents to show fictitious commodity trading. They also testified that the supposed audits of the partnerships were fictitious and that no real auditing ever took place. They explained the trail of the funds from checks made out for investment in the partnership to bank accounts in the Bahamas and Cayman *536 Islands to cash or equivalent available for expenditure by Irwin for his own benefit. For the most part, respondent's witnesses did not describe events they merely observed but described actions which they took themselves or at least participated in. Petitioners urge that we believe Irwin's story of investment although there is no evidence to corroborate his version. Petitioners urge that we disbelieve Hille and other witnesses for respondent because they failed to report their cash income from Irwin, because Hille previously testified falsely for Irwin in other litigation, and because in the past some witnesses for respondent may have violated laws in respects not involving credibility. Hille explained that she testified falsely for Irwin because she feared him. The record includes evidence that Irwin battered his ex-wife and arranged for the severe beating of a former attorney who had failed to cooperate with him. We believe Hille testified falsely in the past out of fear of Irwin. The testimony of Hille, Savant, Rose, Paget-Brown and other former employees of Irwin, and the documentation of financial transactions which corroborates their testimony and contradicts that of *537 Irwin, clearly establishes that Irwin's purported investment of the amounts paid to him by petitioners was a sham. The testimony of Irwin's former associates is confirmed by respondent's expert witness, a consultant experienced in the international metals trade and in commodities trading. Respondent's expert stated: "The tax assistance schemes involving Mr. Irwin are the most obvious and blatant examples of sham that I have ever seen." After examining a substantial amount of the documentation in this case concerning Irwin's operations, he concluded: "I am certain that there was no real trading involved in this case." In support of his conclusion, respondent's expert noted that the supposed trading entities were not known in the trade; there were no proper internal or external controls by persons other than Irwin; the contract numbering system was "erratic and inappropriate for real metal trading"; the jargon used in the documentation often was not that of the metal trade; some trade prices were concocted to fit certain interest rates; the sizes and numbering of "lots" were inappropriate; a real metal trader would be unlikely to operate out of the Cayman Islands or Liechtenstein; *538 none of the trades ever went wrong; the handwritten bookkeeping records "appear to have been carefully constructed at one sitting"; and the number of transactions is too small for a real trading entity. The expert commented adversely on the purported loan documents: The alleged loan documents were shams, bearing unrealistic interest rates, insufficiently delineating collateral, unsatisfactorily stating expiry dates, being issued by unknown financial institutions, and being held by the wrong parties.
Most significantly, respondent's expert witness explained that the transactions were much too large to be realistic for an unknown trader: It is not possible that such large quantities of metal could have been transacted by anyone other than the very strongest and most famous names in the trade. * * * No one could have held such amount of inventory without entirely altering the essential oversupply nature of the market (spot prices lower than forward), and without making himself famous. * * * * * * The inherent risk in the transactions, if they had really taken place, would have involved enormous margin payments, would have incurred much greater losses and profits for the *539 contracting parties, and would have been far too great a burden for the trading parties to bear.
Respondent's expert's report is a compelling showing that the Irwin transactions on their face were unrealistic and could not have taken place and that the Irwin documentation is amateurish fakery. Respondent's expert testified in support of his report in a credible, competent, and precise manner. The expert testimony confirms the explicit and credible testimony of Irwin's former associates. The overwhelming evidence establishes that the purported investments in commodity transactions here were a factual sham. There were no investments in commodity transactions and, consequently, petitioners suffered no losses from commodity trades or from partnerships engaged in such activities. Petitioners only paid for phony documentation of fictitious transactions. Respondent is sustained in the determination that the purported commodity transactions here were factual shams and in his disallowance of the losses from such sham transactions. Accordingly, we need not discuss issues concerning whether the transactions involved economic substance or were carried on for profit or as to the validity *540 of interest deductions claimed with respect to loans which we have found nonexistent. Negligence
Petitioners have the burden of proving that they are not liable for additions to tax under section 6653(a) for 1976, 1977, 1978, and 1979. Rule 142(a). We find that petitioners, Fred and Ilene Amsler, did not meet their burden of proving that they are not liable for the additions to tax for negligence under section 6653(a). Section 6653(a) applies when any part of an underpayment is due to negligence or intentional disregard of the rules and regulations. Negligence is defined as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). We have held that the commodity transactions in the present case never took place and that the entire scheme was a sham. Amsler urged that he relied on advice from a friend, Dr. Lestrange, with regard to the programs offered by Irwin. He also testified that he discussed in "general terms" the investments with his accountant in Williamsport, Pennsylvania. Amsler invested large sums of money into the programs without *541 any significant investigation of his own and claimed very large tax deductions without questioning the validity of the underlying transactions supposedly giving rise to those deductions. Amsler plainly is a person of intelligence and education. He has achieved at least financial success in the medical profession. In his testimony, he gave us no reason to doubt his high level of mental ability. Nevertheless, Amsler urges that he relied upon his old school chum, Dr. Lestrange, in deciding to place substantial amounts with Irwin. Amsler's other investments, year after year, were in tax-oriented transactions. With the deductions he achieved from such other transactions, the deductions Amsler claimed as a result of his payments to Irwin were sufficient to minimize his reported Federal income tax. We have no doubt that in his promotion, Irwin emphasized the tax deductions which could be achieved through investment in his programs. Similarly, we have no doubt that Amsler was interested in the tax deductions. Certainly during all the years here in issue, he claimed substantial deductions resulting from his continued payments to Irwin, and there is no evidence that he made any serious *542 effort to investigate Irwin's repeated failure to show a profit. There is no evidence that Amsler employed anyone to make inquiries about Irwin's operations on his behalf. From the record, we are convinced that Amsler paid Irwin for his assistance in enabling Amsler to claim tax losses. Amsler simply did not make the effort which a prudent person would make to determine that his funds were invested in the manner he claimed on his tax return. He had the resources and the intelligence and education to make such an inquiry but he did not do so. The record as a whole is contrary to Dr. Amsler's self-serving testimony that he invested in the programs in order to earn a profit. Respondent's determinations regarding additions to tax under section 6653(a) are sustained. Section 6621
The final issue for decision is whether Manthey is liable for the increased rate of interest provided by section 6621(c) on substantial underpayments due to tax motivated transactions for 1974, 1976, 1977, 1978, 1979, 1980, and 1981 and whether Amsler is liable for the increased rate of interest under section 6621(c) for 1976, 1977, 1978, and 1979 as determined by respondent. Both Manthey and Amsler *543 bear the burden of proving respondent's determinations are erroneous. Rule 142(a). Section 6621(c) (formerly section 6621(d)) provides that in the case of a "substantial underpayment attributable to tax motivated transactions," the annual rate of interest shall be 120 percent of the underpayment rate under section 6621(a)(2). The term "substantial underpayment attributable to tax motivated transactions" means an underpayment of taxes in excess of $ 1,000 that is attributable to one or more of the tax motivated transactions set forth in section 6621(c)(3). The list of tax motivated transactions includes "any sham or fraudulent transactions." Sec. 6621(c)(3)(A)(v). The increased interest rate is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax motivated transaction was entered into prior to that date and "regardless of the date the return was filed." H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 239; Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). In the present cases, we have *544 held that petitioners Amsler and Manthey are not entitled to deduct losses from their investments in the purported commodities transactions because such transactions were fictitious and sham. Accordingly, we hold that the underpayments resulting from losses and deductions relating to Irwin's programs were attributable to tax motivated transactions within the meaning of section 6621(c)(3)(A)(v), and the interest on the underpayments is to be computed under the increased rate of interest provided for by section 6621(c)(1). To reflect the conclusions reached herein, the concessions of the parties, and to provide for a further trial on the severed issues relating to the gift tax and family trust issues, Decisions will be entered under Rule 155 in docket Nos. 22501-84 and 22732-84. An appropriate Order will be issued in docket Nos. 24448-81, 33599-84, 33741-84, and 33742-84. Footnotes
1. The following cases were consolidated for purposes of trial, briefing, and opinion: Charles E. Manthey and Catherine Manthey, docket Nos. 22501-84 and 22732-84; Fred R. Amsler and Ilene A. Amsler, docket No. 33599-84; Fred R. Amsler, Jr., docket No. 33741-84; Ilene Amsler, docket No. 33742-84.↩
2. All section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩